Richard THOMPSON, Plaintiff,

v.

COMMUNITY ACTION OF GREATER WILMINGTON, INC., a corporation of the State of Delaware, et al., Defendants.

Civ. A. No. 82–115.

United States District Court, D. Delaware.

July 8, 1983.

Bruce L. Hudson, Marin & Hudson, Wilmington, Del., for plaintiff.

Timothy M. Rafferty, Timothy M. Rafferty, P.A., Wilmington, Del., for defendant Ford.

Mason E. Turner, Jr., Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendants other than Ford.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Plaintiff, Richard Thompson, instituted this action pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983 ("section 1983") against the Community Action Agency of Greater Wilmington ("CAGW") and certain officers and members of the CAGW Board of Directors.[1] Thompson alleges violations of his First, Fifth, and Fourteenth Amendment rights in connection with his dismissal as Comptroller of CAGW. Plaintiff also urges three pendent state claims: first, that defendant Fitchett libeled or slandered him; second, that all the individual defendants maliciously interfered with his contract with CAGW; and third, that the acts of CAGW and the individual defendants constituted a breach of his employment contract with CAGW. The defendants have moved, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), to dismiss the complaint.[2]

### I. Background

The complaint alleges that during 1981, while serving in various capacities for CAGW,[3] plaintiff notified defendants Hallman and Slawik, later the CAGW financial committee, and ultimately the CAGW Board of Directors of cash flow and imminent deficit problems as well as possible other financial irregularities in the operation of CAGW. Dkt. 1, ¶¶ 10–12, 14–16, 18. When the Board failed to undertake any significant corrective action, plaintiff's complaint states that, in late 1981, Thompson contacted the local news media about the financial difficulties of CAGW. Id. at ¶ 17. Allegedly, plaintiff was fired by the Board of Directors at a meeting on January 4, 1982 in retaliation for his actions.[4]

Since section 1983 proscribes only certain activities taken "under color of state law," the threshold question in this case is whether defendants were engaged in state action when they dismissed Thompson. On October 1, 1982, the Court held a hearing on defendants' motion to dismiss. After determining that the record was insufficient to draw any conclusion regarding the existence of state action, the Court permitted the parties to supplement the record.[5] The parties proceeded at a relaxed pace and, after discovery regarding the issue, the plaintiff filed a letter memorandum, affidavit, and appendix. The defendant thereaft-

---

1. The individual defendants include: Earl E. Ford, President of the Board of Directors; Elmer Fitchett and Gary Hindes, Board members; and Melvin Slawik and William Hallman, former officers of CAGW. Each has been sued in their individual and official capacities.

2. For purposes of disposition of the pending motion, the Court will accept the allegations in the complaint and will resolve any factual differences in favor of the plaintiff. See Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners, 676 F.2d 81, 84 (3d Cir. 1982).

3. In January 1981, Thompson was a financial planner for CAGW. He became budget manager in March 1981 and was promoted to comptroller in August in which capacity he served until his termination on January 4, 1982. Docket Item ("Dkt.") 1, ¶¶ 8–9.

4. Thompson claims that the decision to dismiss him was made by only two members of the Board, defendants Fitchett and Hindes, in violation of CAGW bylaw § 5.6. Dkt. 1, ¶ 22. This allegation is irrelevant to the issue at hand.

5. By so doing, the Fed.R.Civ.P. 12(b)(6) motion has been transformed into a motion for summary judgment pursuant to Fed.R.Civ.P. 56. See Fed.R.Civ.P. 12(b)(6). The parties have expressed their acquiescence in treating this motion as one for summary judgment and have been afforded the "reasonable opportunity to present all materials made pertinent" as required by Rule 12(b)(6). See Crown Central Petroleum Corp. v. Waldman, 634 F.2d 127, 129 (3d Cir.1981).

er declined to further supplement the record.

CAGW is a community action agency. The genesis of such agencies may be traced to the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2781–2837 (1976) (repealed) ("the EOA"). The EOA was enacted to promote and foster the creation of community action agencies that would coordinate federal, state and private efforts to eliminate poverty through localized programs. *See* 42 U.S.C. § 2781(a) (repealed) (congressional statement of purpose). While Congress left broad discretion to the local communities in the operation of the agencies, the EOA did establish guidelines for the structure and functions of these agencies. *Id.* at §§ 2790–2808 (repealed); *see also* H.R.Rep. No. 1458, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad. News 2900, 2909. Compliance with these statutory provisions was required in order to receive federal funding.[6]

The EOA afforded the state discretion to determine the basic form of the community action agency. The statute provided that "[a] community action agency shall be a state or political subdivision of a State ... or a combination of such political subdivisions, or a public or private nonprofit agency or organization which has been designated by a State." 42 U.S.C. § 2790(a) (repealed). Local governments could decline to be included in the community action program of a community action agency. *Id.* at § 2790(e) (repealed).

If a state decided to designate a private non-profit entity as the community action agency, rather than one of its own public bodies, the EOA required that the board of directors of the entity conform to the following requirement:

> Each board to which this subsection applies shall consist of not more than fifty-one members and shall be so constituted that (1) one-third of the members of the board are elected public officials, or their representatives, except that if the number of elected officials reasonably available and willing to serve is less than one-third of the membership of the board, membership on the board of appointive public officials may be counted in meeting such one-third requirement.

42 U.S.C. § 2791(b) (repealed). Congress also established the authority of the board:

> The powers of every community action agency governing board shall include the power to appoint persons to senior staff positions, to determine major personnel, fiscal, and program policies, to approve overall program plans and priorities, and to assure compliance with conditions of and approve proposals for financial assistance under this subchapter.

*Id.* at § 2791(e) (repealed).

CAGW is a private non-profit Delaware corporation organized to fulfill the goals of the EOA. It was created and designated as the official anti-poverty agency for New Castle County, Delaware in the mid-1960's. CAGW received approximately 70 percent of its funding from federal funds, 20 percent from the state funds, 9.5 percent from local funds, and one-half of one percent from private sources. Affidavit of Richard A. Thompson, Dkt. 30, ¶ 8.

During 1981, the period in question, CAGW's Board of Directors complied with

---

**6.** The EOA and relevant regulations limit federal participation to basically an oversight function. The Community Services Administration ("CSA"), an agency within the then Department of Health Education and Welfare was the regulatory body charged with oversight of community action agencies receiving federal funding. CSA regulations required yearly audits and grant review, limited the political activities of community action agency employees by precluding lobbying activities, and placed a salary cap of $18,000 on employees. *See* 45 C.F.R. §§ 1010–1100 (1981). In addition, there were extensive regulatory provisions dealing with programs administered by community action agencies such as Head Start, Crisis Intervention, and Energy Crisis assistance. 45 C.F.R. §§ 1304, 1061. Under the Reagan administration, the EOA was repealed and the CSA phased out. The program was replaced by the so-called "block grant" programs. *See* 45 C.F.R. 1010–1100 (1982).

the statutorily mandated composition of public, private and target group members.[7] The Board designated and delegated power over daily operations to the Executive Director, defendant Hallman, and Deputy Director, defendant Slawik, as permitted by the EOA. 42 U.S.C. § 2791 (repealed).

CAGW worked closely with the Delaware Office of Economic Opportunity, the state agency charged with oversight of CAGW's receipt and utilization of state, local, and federal funding. The state entered into several contracts with CAGW focusing on energy conservation and assistance and food programs designed to alleviate the plight of low income citizens of New Castle County. Dkt. 41, P. 2–3.

As noted, the plaintiff has alleged violations of the First and Fourteenth Amendments as a section 1983 claim against CAGW as an entity acting under color of state law. In addition, plaintiff has argued that CAGW is a federal instrumentality and has deprived plaintiff of his job without due process thus violating the Fifth Amendment and has violated his First Amendment rights. These alternative theories will be considered seriatim. Finally, plaintiff's pendent state law claims will be addressed.

## II. CAGW's Action as State Action

■ Plaintiffs bringing suits pursuant to section 1983 must demonstrate that the defendant was acting under color of state law.[8] Generally, this requirement has been held to require the same showing of state action as required by the Fourteenth Amendment. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928–32, 102 S.Ct. 2744, 2749–51, 73 L.Ed.2d 482 (1982); *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966).

The ultimate issue in cases brought pursuant to section 1983 is whether the alleged infringement of rights is "fairly attributable to the state." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (quoting *Lugar v. Edmondson Oil Co.*, 102 S.Ct. at 2754). Several different factors or tests have been enunciated by the Supreme Court in cases where nominally private parties are sought to be held accountable for state action. Some examples include: first, whether the private party was performing a "public function," *see Terry v. Adams*, 345 U.S. 461, 469, 73 S.Ct. 809, 813, 97 L.Ed. 1152 (1953); second, whether the private party was acting under "state compulsion," *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970); third, whether there was a "symbiotic relationship" between the state and the private party, *see Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724–25, 81 S.Ct. 856, 861–862, 6 L.Ed.2d 45 (1961); fourth, whether there was a "nexus" between the allegedly illegal action and the state, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357–58, 95 S.Ct. 449, 456–457, 42 L.Ed.2d 477 (1974); and fifth, whether there has been "joint action" by the private party and the state, *see Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978). Essentially, these various articulations simply represent the necessarily fact-bound inquiry concerning the nature of the private party charged with state action; nonetheless, certain of the articulations are more stringent than others.

The United States Court of Appeals for the Third Circuit has stated the test to be applied in determining whether a defendant's actions demonstrate sufficient state

---

**7.** For a listing of the members of the Board from the public sector, see Dkt. 41A at A10–A11, A17.

**8.** Section 1983, 42 U.S.C. § 1983, provides:
Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes

to be subjected, any citizen of the United States or other person within the jurisdiction thereto to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

involvement to implicate section 1983, as follows:

'[W]hether there is a sufficiently close nexus between the state and the challenged action ... so that the action of the latter may be fairly treated as that of the State itself.' *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345 [95 S.Ct. 449, 42 L.Ed.2d 477] (1974), or whether the 'State has so far insinuated itself into a position of interdependence with [the agency] that it must be recognized as a joint participant in the challenged activity.' *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725 [81 S.Ct. 856, 861, 6 L.Ed.2d 45].

*Hollenbaugh v. Carnegie Free Library,* 545 F.2d 382, 383 (3d Cir.1976). In deciding whether to apply the *Burton* test (as noted, the "symbiotic relationship" test) or the more stringent *Jackson* test (similarly, the "nexus" test), the Third Circuit appellate court has stated that only in the absence of "an inextricably linked relationship between the state and the private entity does the 'close nexus' test of *Jackson* come into play." *Braden v. University of Pittsburgh,* 552 F.2d 948, 958 (3d Cir.1977) (en banc). In other words, only where the defendant engages in a private, as opposed to a public, activity and only in the absence of a significant relationship between the state and the defendant, will the Third Circuit Court of Appeals apply the *Jackson* test to determine if state action is present. *See Chalfant v. Wilmington Institute,* 574 F.2d 739, 746 (3d Cir.1978) (en banc) (implying that *Jackson* test is limited to businesses performing a private function).

The Third Circuit Court of Appeals, on the other hand, consistently has applied the *Burton* test to determine whether an actor or an agency performing a "governmental function" has been involved in state action. *See, e.g., Benner v. Oswald,* 592 F.2d 174, 178–80 (3d Cir.) (actions of college administrators satisfy *Burton* test), *cert. denied,* 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979); *Chalfant v. Wilmington Institute,*

574 F.2d at 744–46 (actions of library administrators satisfy *Burton* test); *Braden v. University of Pittsburgh,* 552 F.2d at 956–61 (actions of college administrators satisfy *Burton* test); *Hollenbaugh v. Carnegie Free Library,* 545 F.2d at 383–85 (actions of library administrators satisfy *Burton* test). The Third Circuit Court of Appeals has not only frequently applied the *Burton* test to section 1983 suits involving public educational activities, but also has applied the test in a broad fashion. For example, in *Chalfant,* a case involving the discharge of an employee by the Wilmington Public Library, the court held that the *Burton* test was satisfied where the library received over 90 percent of its revenues from tax sources, where some members of the library's governing board held state office, and where the library was situated on city-owned property. 574 F.2d at 745. Under the *Burton* analysis, the court held that state action was present for purposes of section 1983 even though the state had nothing to do with the decision to discharge the plaintiff.

This series of cases represent a somewhat troubled and tortuous path taken by the Third Circuit Court of Appeals regarding questions of state action. As noted, two of the cases, *Chalfant* and *Braden,* were en banc opinions. In each case vigorous dissents were written. Much of the dissension may be traced to a lack of Supreme Court guidance regarding state action by private entities. On June 25, 1982, however, the Supreme Court promulgated a trilogy of decisions that substantially clarify this area of the law and delineate the proper course for lower courts to follow. *See Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

In *Rendell-Baker,* a teacher dismissed from his job sued the defendant, the Director of the New Perspectives School, a

non-profit, private institution specializing in the education of students with drug, alcohol, or behavioral problems or other special needs. 102 S.Ct. at 2766–67. Local authorities and the area public school referred all of the school's students to the school and the school received at least 90 percent of its funding from government sources. Further, although the teachers were not technically state employees, the school was heavily regulated under Massachusetts state law. The private school, however, was operated by a Board of Directors, none of whom were public officials or their representatives.

Various First and Fourteenth Amendment claims were forwarded in this section 1983 suit, but the Supreme Court held that the school was not acting under color of state law when dismissing the plaintiff. In doing so, the Court significantly restricted the use of the *Burton* test in state action analysis to two situations: first, where the function performed by the entity has been "traditionally the *exclusive* prerogative of the state," *id.* at 2772; and second, where the symbiotic relationship between the entity and the state is such that the entity's actions at issue directly benefit, in some financial capacity, the state. *Id.; see also Gerena v. Puerto Rico Legal Services,* 697 F.2d 447 (1st Cir.1983).

The Supreme Court held in *Rendell-Baker* that the New Perspectives School was not performing a function within the exclusive realm of the state because until recently, the State of Massachusetts was not involved with providing an education for those students not succeeding in public school. 102 S.Ct. at 2772. Consequently, the matter had also been a private concern. Further, the Court determined that there was no symbiotic relationship between the school and the state even though at least 90 percent, and as much as 99 percent, of the school's funding came from government sources. *Id.* Therefore, the Court held that *Burton* did not apply to this situation. The Court concluded that no state action

was involved because no nexus existed between the state and the decision to dismiss the plaintiffs.

In *Blum v. Yaretsky,* residents of a private nursing home challenged the nursing home's decision to transfer them to a different facility. 102 S.Ct. at 2781. The plaintiff claimed that the nursing home was involved in state action for three reasons: first, it was acting to comply with state Medicare regulations when it transferred the plaintiffs; second, the state provided medical expenses for over 90 percent of the home's residents; and third, the state licensed the nursing home. The Supreme Court concluded that these facts did not constitute state action for four reasons. First, the Court stated that extensive state regulation of the private nursing home is irrelevant to a state action determination. *Id.* at 2786. Second, the Court stated that, "a State normally can be held responsible for a private decision only where it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the State." *Id.* The Court concluded that the decision to transfer the patients was not a decision of the state. Third, the Court held that state action may be present where a private entity has exercised powers that are "traditionally the exclusive prerogative of the State." *Id.* (citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 353, 95 S.Ct. at 455). The Court concluded that the providing of nursing home facilities was not an exclusive state function. *Id.* 102 S.Ct. at 2789. Fourth, the Court held that the *Burton* symbiotic relationship analysis was not applicable. In a limited reading of *Burton,* the Court stated that, "privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton." Id.* The Court concluded that the nursing home was not engaged in state action. *Id.* at 2788–90.

In *Lugar v. Edmondson Oil,* the final leg of the trilogy, the Supreme Court addressed

the question of state action somewhat differently because, in effect, it found satisfaction of the nexus requirement. In *Lugar* the Supreme Court found state action when a private party utilized a state prejudgment attachment statute to deprive a debtor of his property without due process of law. 102 S.Ct. at 2757. After discussing the congruity between the state action and under color of state law requirements, the Court delineated a two-part test to determine whether a private action is fairly attributable to the state:

> First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a person for whom the state is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state.

*Id.* at 2754. In effect, this is simply a restatement of the *Jackson* test which requires a nexus between the state and the alleged deprivation, rather than the more lenient *Burton* test of symbiosis. In other words, simply because a person or entity is a state actor, a finding of state action does not necessarily follow. *See Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (public defender, a state employee, not engaged in state action when performing traditional function of a lawyer representing a criminal client).

The Supreme Court's pronouncements reflect a rationalization of the inquiry interposed on state action cases. Furthermore, it expressly confines the *Burton* symbiotic relationship test to two narrow categories not evident here. As such, the test as utilized by the Third Circuit Court of Appeals in *Braden, Chalfant,* and *Hollenbaugh* cannot be utilized here. *See Gerena v. Puerto Rico Legal Services,* 697 F.2d 447 (1st Cir.

1983) (*Burton* analysis limited to situations when government benefits financially from defendant's action); *Chaney v. National Railroad Passenger Corporation,* No. 82–339, slip op. at 7 (D.Del. Feb. 17, 1983) (applies *Rendell-Baker* and *Blum* in finding no state action); cf. *Old Colony Trust Co. v. United States,* 300 F.Supp. 1032, 1035 (D.Mass.1969), aff'd, 423 F.2d 601 (1st Cir. 1970) (district court must follow intervening Supreme Court precedent that conflicts with established circuit court precedent.)

At least one appellate court has utilized the recent Supreme Court pronouncements in a case dealing with the discharge of an employee from a community action agency. *See Gilmore v. Salt Lake Community Action Program,* 710 F.2d 632 (10th Cir.1983). In *Gilmore,* the court found that the close involvement of the state government in the operation of the community action agency justified a finding that the entity was a state actor.

■ The Court agrees with the *Gilmore* analysis and finds CAGW was a state actor for purposes of one prong of the state action test as enunciated by the Supreme Court in *Lugar.* As noted, there has been substantial state and local governmental involvement in the creation and operation of CAGW. *See supra* pp. 1160–61 and accompanying notes. Given the state's exercise of its prerogative to designate CAGW as a community action agency eligible to receive federal funds and noting the ability of political subdivisions to exercise a veto power and elect to be excluded from any program administered by CAGW, the state has been inexorably associated with the creation of CAGW. Mere creation, however, may not be sufficient to support a finding that CAGW is a state actor. Nonetheless, the state participated in the continuing operations of CAGW through the statutorily mandated requirement that at least one third of the Board of Directors must be state or local officials or their representa-

tives.[9] These public officials serve on the board not in an honorary or figurehead capacity, but rather to secure "the services of assistance of public officials" to eliminate poverty. 42 U.S.C. § 2781(a)(5) (repealed). The Court agrees with the United States Court of Appeals for the Tenth Circuit in finding that the lack of a majority of public officials on the board is irrelevant to a conclusion that CAGW is a state actor. Judge McKay wrote in a particularly compelling passage:

When public officials serve on a governing board of an institution, there is always some risk that the officials may advance governmental objectives through the institution. When the officials serve on the board to offer service and assistance *qua* governmental officials, when their presence on the board is a requirement for federal funding, and when the decisions of the board often involve issues of public interest, there exists a substantial risk that governmental objectives can influence institutional action. Accordingly, the institution becomes a state actor even if, as here, the public officials maintain only a minority representation on the governing board. The potential for government influence cannot be directly calibrated to the number of officials on the board; the officials, by virtue of the requirement of their presence and the power of their positions, can exercise influence far in excess of their proportional representation.

*Gilmore v. Salt Lake City Community Action Program,* 710 F.2d at 637–38 n. 12 (10th Cir.1983). *But see McVarish v. Mid-Nebraska Community Mental Health Center,* 696 F.2d 69 (8th Cir.1982) (majority of public officials on board sufficient to support finding of state action). The Court concludes that CAGW is a state actor and

thereby satisfies one prong of the *Lugar* analysis.

This holding, however, does not end the inquiry and does not, in and of itself, render CAGW and the defendants liable for actions cognizable under section 1983. Also to be satisfied is the second aspect of the *Lugar* test: whether the alleged deprivation of rights resulted from the exercise of a right, privilege, or rule of conduct having its source in state authority. *Lugar v. Edmondson Oil Co.,* 102 S.Ct. at 2754. Despite the broad and amorphous language of the complaint, plaintiff has articulated this aspect of his claim as follows:

First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible. Plaintiff would contend that this requirement is met since the state is responsible for the activities of C.A.G.W. through its office of economic opportunity.

Dkt. 30, at 8 (Plaintiff's Answering Brief Opposing Defendant's Motion to Dismiss).[10] While CAGW is a state actor, not all actions by such actors constitute state action. *See Lugar v. Edmondson Oil Co.,* 102 S.Ct. at 2798–99 n. 6; *Polk County v. Dodson,* 454 U.S. at 324–25; *Gilmore v. Salt Lake Community Action Program,* 710 F.2d at 638 (10th Cir.1983). Confining plaintiff to his articulated theory, there has been no showing that a state created right or procedure was involved with personnel decisions of any type. The absence of personnel regulations regarding hiring, firing, discipline, and duties applicable to CAGW are particularly telling given the involvement of the state in other areas of CAGW's activities. *See supra* pp. 1160–61.

The participation of public officials on the Board in the termination decision does

---

**9.** The status of representatives of state or local officials as sufficient to support a conclusion that CAGW is a state actor constitutes an interesting but irrelevant question in this context because several Board members were state or local officials. *See supra* p. 1162 and note 7.

**10.** Given this articulation of his claims and in the absence of any mention or discussion by any party, the Court will confine plaintiff's theory in a like manner.

not compel an inference that the personnel policies are dictated by the state. While representatives of the public serve on the Board for purposes of promoting governmental objectives, these Board members do not advocate or represent governmental personnel policies since no such policy is applicable to CAGW. *Gilmore v. Salt Lake Community Action Program,* 710 F.2d at 638 (10th Cir.1983).

In light of these findings, the Court concludes that no state action was involved in the decision to terminate Thompson's employment. While CAGW may be a state actor, there was no state action because the deprivation was not of a state created right. In other words, under *Jackson* analysis, there is no nexus between the action and the state.[11]

III. *CAGW as a Federal Instrumentality*

Plaintiff argues that CAGW is a federal instrumentality and, as such, has deprived plaintiff of his Fifth Amendment rights by terminating his employment without due process. This claim has two aspects: first, whether CAGW is a federal instrumentality; and second, if so, whether plaintiff has been deprived of a property right. Because the Court finds that CAGW is not a federal instrumentality, the latter question need not be addressed.

 Plaintiff asserts that the extensive federal regulation and federal funding dictate a finding that CAGW, an ostensibly private organization, is a federal instrumentality. As noted, CAGW was subject to significant federal regulation concerning its creation and its receipt and expenditure of funds. Further, the vast majority of its funding came from the federal government. *See supra* p. 1161. The Supreme Court in both *Blum* and *Rendell-Baker* concluded that extensive state regulation and funding was insufficient to justify a finding that a private entity was engaged in state action. *See supra* pp. 1163–64. These holdings are equally applicable to the question of whether federal regulation and funding transmogrifies CAGW into a federal instrumentality. *See Gilmore v. Salt Lake Community Action Program,* 710 F.2d at 636 (10th Cir.1983).

Absent some "other factors" indicating federal governmental participation in CAGW's actual operations, there is no federal action. As the Supreme Court commented in another context regarding community action agencies:

> Nothing could be plainer than the congressional intent that the local entities here in question have complete control over operations of their own program with the Federal Government supplying financial aid, advice, and oversight only to assure that federal funds not be diverted to unauthorized purposes.

*United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (footnote omitted) (addressing application of Federal Tort Claims Act to community action agencies). Here plaintiff has made no showing of federal involvement in CAGW other than general regulation and funding,[12] as such, CAGW is not a federal instrumentality and the decision to terminate may not be challenged under the Fifth Amendment. *Ac-*

---

11. Other courts, prior to the Supreme Court trilogy, have declined to find any state action in termination of community action agency employees. *See Griffith v. Bell-Whitley Community Action Agency,* 614 F.2d 1102, 1109 (6th Cir.) (no nexus because discretion to terminate employees left to agency), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3025, 65 L.Ed.2d 1122 (1980); *Joseph v. Community Action Comm'n to Help the Economy, Inc.,* 503 F.Supp. 73, 75 & n. 6 (S.D.N.Y.1980) (even though public board members involved, no nexus between state and personnel decisions); *Joseph v. Ul-* *ster County Community Action Comm'n,* 475 F.Supp. 944, 948 (S.D.N.Y.1979) (state not involved in personnel decisions).

12. Plaintiff alleges certain federal regulations related to personnel policies and, therefore, federal involvement is evident. The regulations, however, were only general proscriptions relating to lobbying by employees and in no way indicate a federal intrusion into the discretionary realm of CAGW's personnel policy. *See supra* note 6.

cord *Gilmore,* 710 F.2d at 636 (10th Cir. 1983); *Griffith v. Bell-Whitley Community Action Agency,* 614 F.2d 1102, 1108; *Hines v. Cenla Community Action Committee Inc.,* 474 F.2d 1052, 1057–58 (5th Cir.1973); *Joseph v. Ulster County Community Action Committee Inc.,* 475 F.Supp. at 948; *Kelley v. Action For Boston Community Development, Inc.,* 419 F.Supp. 511, 525–27 (D.Mass. 1976).[13]

## IV. Thompson's Pendent State Law Claims

 Having found both an absence of state and federal action, all of the federally cognizable aspects of this litigation are eliminated. The plaintiff retains his pendent state law claims concerning alleged breach of contract, libel and slander, and tortious interference with contract. Absent significant investment of time and resources in a particular case, the Supreme Court indicated in *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), that the exercise of pendent jurisdiction is improper where the underlying federal claim is dismissed prior to a trial on the merits. *See Local 435 of the International Union, United Automobile, Aerospace and Agricultural Workers of America v. General Motors Corp.,* 552 F.Supp. 395, 397 (D.Del.1982); *Wilmington Christian School, Inc. v. Board of Education of Red Clay Consolidated School District,* 545 F.Supp. 440, 449 (D.Del. 1982). Since neither judicial nor litigant time has been expended on these pendent claims, the Court will decline to exercise pendent jurisdiction and will dismiss the pendent claims.

## V. Conclusion

The Court holds that CAGW was engaged neither in state nor federal action when it terminated Thompson. Consequently, summary judgment will be entered for defendants on these claims and, having disposed of all federally cognizable claims as asserted, the Court will decline to exercise pendent jurisdiction over the state claims.

---

**13.** The United States Court of Appeals for the Ninth Circuit has found that community action agencies are federal instrumentalities due to extensive funding and regulation. *See Mathis v. Opportunities Industrialization Centers, Inc.,* 545 F.2d 97 (9th Cir.1976); *Ginn v. Matthews,* 533 F.2d 477 (9th Cir.1976). Reliance on these cases, as suggested by plaintiff, appears inappropriate in light of *Blum* and *Rendell-Baker.*